# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

**MARTIN ALVAREZ**                    **NO. 1:11-CV-0783**

**v.**                                **JUDGE CONNER**

**SEARS HOLDING CORP.,**              **MAGISTRATE JUDGE METHVIN**
**KMART CORPORATION,**
**JAMES HALL,**
**ERIN ROAT**

## REPORT AND RECOMMENDATION
## ON MOTION FOR SUMMARY JUDGMENT
### (Doc. 27)

Martin Alvarez filed this employment discrimination action on April 22, 2011 (Doc. 1) and thereafter filed an amended complaint on May 31, 2011 (Doc. 12). The amended complaint alleges racial discrimination as well as retaliation and a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.; 42 U.S.C. § 1981 and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq*.[1] Named as defendants are Sears Holding Corp.; Kmart Corp., which Sears oversees and of which it directs the operations (collectively, the "company"); James Hall, general manager of the of the company's Chambersburg Distribution Center; and Erin Roat, operations manager

---

[1] Specifically, the amended complaint brings claims for racial discrimination (Count I), retaliation (Count II), and hostile work environment (Count III), all under § 1981; and it brings the same claims under the PHRA (Count IV) and Title VII (Count V).

of the company's Chambersburg Distribution Center. This court has jurisdiction over the matter under 28 U.S.C. § 1331.

Before the court is a motion summary judgment filed by defendants.[2] The motion has been referred to the undersigned for a report and recommendation and is now ripe for disposition.[3]

## FINDINGS AND RECOMMENDATIONS

### I. Background[4]

Viewed in a light most favorable to Alvarez, the factual background is as follows: Alvarez is a male of Hispanic descent. (Doc. 31, 34 ¶ 1). He began working for Kmart in 1986. (Docs. 29, 32 ¶ 1). He transferred to the Chambersburg Distribution Center in 2001 where he was the Receiving Manager.

---

[2] Defendants filed a motion for summary judgment on May 2, 2012 (Doc. 27) along with a supporting brief and a statement of material facts. (Doc. 28, 29). Alvarez filed a brief in opposition to the motion (Doc. 30) along with a statement of facts (Doc. 31) and a response to defendants' statement of facts (Doc. 32) (docketed as a brief in opposition) on May 23, 2012. Defendants filed a reply brief (Doc. 33) and a response to Alvarez's statement of facts (Doc. 34) on June 6, 2012, to which Alvarez filed a sur-reply brief on June 18, 2012 (Doc. 38).

[3] Judge Conner referred the pending motion to the undersigned by Order dated September 26, 2012. (Doc. 41).

[4] In support of his Statement of Material Facts (Doc. 31), Alvarez has included exhibits. However, he indicates therein that several of the deposition transcripts on which he relies to support his statements of material fact will be provided in hard copy to the court via overnight mail. (*See* Doc. 31, Ex. B, E–M). A review of the case file does not include these transcripts and it thus appears that such transcripts were not provided to the court.

(Docs. 29, 32 ¶¶ 2, 3). Prior to 2007, Alvarez had mostly satisfactory performance reviews. (Docs. 31, 34 ¶ 11; Doc. 31, Ex. U).

James Hall was the Assistant General Manager of the Chambersburg Distribution Center from September, 2006 until July, 2008, at which time he became General Manager. (Docs. 29, 32 ¶ 5). Jeffrey Diamond became Assistant General Manager in December, 2008. (Docs. 31, 34 ¶ 16). In 2007, nine Kmart and Sears distribution centers were consolidated into four distribution center. (Docs. 29, 32 ¶ 4). Hall testified that the consolidation in 2007 resulted in dramatic changes in business at the Chambersburg Distribution Center and caused a significant volume in work in the receiving department. (Docs. 29, 32 ¶¶ 4, 6).

Charles English, Inbounds Operations Manager, directly supervised Alvarez for 9–12 months (Docs. 31, 34 ¶ 20). English, who is African American, testified that Hall stated that "there were too many minorities in the workplace." (Doc. 31 ¶ 22; Doc. 31, Ex. V). As a member of the Interview Panel, English testified that he observed that non-minorities were receiving hiring preference. (Doc. 31 ¶ 24). Alvarez, also a member of the Panel, testified that management was not hiring minorities. (Doc. 31 ¶ 26). However, both English and Alvarez were subsequently removed from the Interview Panel. (Doc. 31 ¶ 25, 26). English also testified about comments made that he felt were derogatory or carried racial tones: Hall asked

him if he had a crack pipe; Hall commenting that "all brothers have a leather coat"; and being referred to as Buckwheat by Erin Roat, Repack Operations Manager. (Docs. 31, 34 ¶¶ 32, 33, 36).

In January, 2008, Alvarez was placed on a Performance Improvement Plan ("PIP"). (Docs. 29, 32 ¶ 9). Alvarez testified that he was surprised when presented with the PIP inasmuch as productivity in his department was up by 30% in all areas. (Docs. 31, 34 ¶ 44). In response to the PIP, Alvarez understood that his performance needed to improve. (Docs. 29, 32 ¶ 11). He was transferred in May, 2008 to the Casepack Department as Casepack Manager. (Docs. 29, 32 ¶ 12). Alvarez was being supervised at this time by Kenny Bannigan, the Casepack Operations Manager. (Docs. 29, 32 ¶ 10). Alvarez's performance improved as a result of the first PIP, which he successfully completed. (Docs. 29, 32 ¶ 15). He testified that his move to the Casepack Department helped him improve his performance. (Docs. 29, 32 ¶ 16).

Alvarez's 2008 mid-year review by Bannigan contained numerous points of positive feedback ans noted that he had made good improvements. (Docs. 31, 34 ¶ 58). Additionally, although it contains some areas in which he needed development, Alvarez's 2008 end-year review that he had shown great improvement. (Docs. 31, 34 ¶ 59). William Muldowney, the HR manager, testified

that Bannigan wanted to rate Alvarez significantly higher, but that Hall opposed it. (Doc, 31, 34 ¶ 60).

Alvarez was subsequently transferred from the first shift to the third shift in the Casepack Department. (Docs. 29, 32 ¶ 18). While defendants contend that the transfer was not punitive, Alvarez contends that it was. (Docs. 29, 32 ¶ 30). Muldowney also testified that he was approached by Hall and others about the possibility of terminating Alvarez buy Muldowney stated that there was no recent disciple or sufficient documented performance problems to do justify his dismissal. (Doc. 31, 34 ¶ 62). Muldowney also categorized Alvarez's transfer to the third shift as a disciplinary move taken because, as Diamond stated to him, they could not fire Alvarez. (Docs. 31, 34 ¶ 68).

Defendants subsequently accused Alvarez of failing to immediately report an accident, per company policy. (Doc. 29 ¶¶ 24, 26). Alvarez testified that, once he became aware of it, he reported the accident in a timely manner. (Doc. 32 ¶ 27). Latrelle McKinney, the Third Shift Operations Manager, testified that Alvarez's performance did not improve. (Docs. 29, 32 ¶¶ 31, 32).

In October, 2009, there was an investigation into a potentially inappropriate relationship between two of Alvarez's subordinates. (Docs. 29, 32 ¶ 33). Defendants maintain Alvarez of giving inconsistent responses to questions about

his observations. (Doc. 29 ¶ 34). Alvarez asserts that his observations were remote and he lacked sufficient knowledge to answer their questions. (Doc. 32 ¶ 34). Additionally, although defendants contend that Alvarez was instructed not to discuss the investigation with anyone but then mentioned the matter to Matt Fisher, the subject of the investigation, Alvarez denies that he discussed the investigation with Fisher. (Docs. 29, 32 ¶ 40).

Alvarez was placed on a second PIP in October, 2009. (Docs. 29, 32 ¶ 41). When questioned about the second PIP's statement that he needed improvement, Alvarez testified that he had communicated to management that his difficulty in the department because he had received no training. (Doc. 32 ¶ 42). In response to the second PIP, Alvarez sent an email to defendants claiming discrimination based on race, and as a result suffered retaliation. (Docs. 29, 32 ¶ 81; Doc. 32 ¶ 82).

McKinney testified that Alvarez failed to improve his performance during the second PIP. (Doc. 29 ¶ 56). Alvarez contends that he successfully completed the PIP and exceeded expectations, but that nothing he did was satisfactory to the defendants. (Doc. 32 ¶ 56). Alvarez stated that Hall yelled at him in front of over 20 employees for failing to meet goaIn fact, Alvarez testified, things became worse, he had to walk on eggshells and the defendants questioned his every action. (Docs. 31, 34 ¶¶ 114, 115).  Alvarez stated that Hall yelled at him in front of over

20 employees for failing to meet goals. (Doc. 31 ¶ 117). In a fundraising effort,

Roat told Alvarez to bring his family and do a taco dance. (Doc. 31 ¶ 121).

Additionally, despite the fact that he informed them that he is a diabetic,

defendants accused Alvarez of eating in the warehouse when candy and soda cans

were found in his trash. (Docs. 31, 34 ¶ 122).

As a result of defendants' view that Alvarez failed to improve after the

second PIP, he was terminated in January, 2010. (Docs. 29, 32 ¶ 59). The present

action followed. Hall, Roat and Diamond participated in the decision to terminate

him. (Doc. 34 ¶ 132).

## II. Issues Presented

The motion raises the following issues for summary judgment:

A.  Alvarez is unable to establish his discrimination claim under §1981, Title VII or the PHRA.

B.  Alvarez is unable to establish claim for retaliation under §1981, Title VII or the PHRA.

C.  Defendants are entitled to summary judgment on Alvarez's hostile work environment claims because he has failed to state a prima facie case under §1981, Title VII or the PHRA.

## III. Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P.

56(a). "[T]his standard provides that the mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment; the requirement is that there be no *genuine* issue of

*material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would

affect the outcome of the case under applicable substantive law. *Anderson*, 477

U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).

An issue of material fact is "genuine" if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257;

*Brenner v. Local 514, United Bd. of Carpenters & Joiners of Am.*, 927 F.2d 1283,

1287–88 (3d Cir. 1991).

When determining whether there is a genuine dispute of material fact, the

court must view the facts and all reasonable inferences in favor of the nonmoving

party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail

Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862

F.2d 56, 59 (3d Cir. 1988). In order to avoid or obtain summary judgment,

however, parties may not rely on unsubstantiated allegations. Parties seeking to

establish that a fact is or is not genuinely disputed must support such an assertion

by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed. R. Civ. P. 56(c)(1); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed. R. Civ. P. 56(e).

## IV. Discussion

*(A) Discrimination*

The amended complaint asserts racial discrimination in violation of Title

VII and the PHRA. Under Title VII, it is unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to
> discriminate against any individual with respect to his compensation,
> terms, conditions, or privileges of employment, because of such
> individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000(e)(2). The PHRA likewise prohibits discrimination by employers

on the basis of gender or race. *See* 43 P.S. § 955.[5] Alvarez also brings his claims

for discrimination under 42 U.S.C. §1981, which states:

> (a)  Statement of equal rights
>      All persons within the jurisdiction of the United States shall
>      have the same right in every State and Territory to make and
>      enforce contracts, to sue, be parties, give evidence, and to the
>      full and equal benefit of all laws and proceedings for the
>      security of persons and property as is enjoyed by white citizens,

---

[5]  The court will analyze Alvarez's Title VII and PHRA claims under the same standards
inasmuch as courts generally have interpreted the PHRA in accordance with the standards
applied to claims brought under Title VII of the Civil Rights Act of 1964. *Grande v. State
Farm Mut. Auto. Ins. Co.*, 83 F. Supp. 2d 559, 562 (E.D. Pa. 2000). Additionally, the
Third Circuit has held that claims under § 1981 "require the same elements of proof as a
Title VII action." *Lewis v. University of Pittsburgh*, 725 F.2d 910, 915 n. 5 (3d Cir.1983);
*see also Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir.2009) ("[T]he substantive
elements of a claim under section 1981 are generally identical to the elements of an
employment discrimination claim under Title VII.").

and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b)    "Make and enforce contracts" defined
For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c)    Protection against impairment
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

In considering a motion for summary judgment in a Title VII case where, as here, a plaintiff's case relies upon indirect evidence, the Court of Appeals for the Third Circuit applies the three-step burden-shifting scheme articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must show a prima facie case. If the plaintiff is able to establish a prima facie case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for its actions "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *see also Sarullo v. U.S. Postal Service*, 352 F.3d 789, 799 (3d Cir.

2003) (noting that the defendant must "clearly set forth, through the introduction of admissible evidence, reasons for its action which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.") (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 507) (internal quotation marks omitted).

If the employer offers evidence of a legitimate, non-discriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff, who must then show that the reasons offered by the employer are mere pretexts for discrimination. *Young v. Pennsauken Twp. School Dist.*, 47 F. App'x. 160, 161 (3d Cir. 2002) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53 252-54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).[6] To show pretext, a plaintiff must identify evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Potoski v. Wilkes University*, 692 F. Supp. 2d 475, 484 (M.D. Pa. 2010) (Vanaskie, J.) (quoting *Fuentes*, 32 F.3d at 764). The

---

[6] Within this framework, although the burden of production shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

plaintiff may make this showing in either of two ways. One, the defendant's proffered reasons may be shown to be "weak, incoherent, implausible, or so inconsistent that 'a reasonable factfinder could rationally find them unworthy of credence.'" *Keller v. Orix Credit Alliance, Inc*., 130 F.3d 1101, 1108–09 (3d Cir. 1997); *accord Fuentes* 32 F.3d at 765. Two, the plaintiff may provide "evidence that 'the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it could not have been the employer's real reason." *Id*. (quoting *Jones*, 198 F.3d at 413). Thus, summary judgment is appropriate on behalf of the employer if the employee fails to meet her burden at either the prima facie or the pretext stage of the framework.

Generally, a prima facie case of discrimination is demonstrated by the following elements: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the job in question; (3) plaintiff suffered an adverse employment action; and (4) circumstances existed that support an inference of discrimination. *See Geraci v. Moody-Tottrop, Int'l, Inc.*, 82 F.3d 578, 580–81 (3d Cir. 1996) (citing *Burdine*, 450 U.S. at 253 ); *McDonnell Douglas Corp.*, 411 U.S. at 802. The fourth prong of the prima facie case may be shown by sufficient evidence that non-members of the protected class were treated more favorably. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000). A plaintiff's

burden at this step is "minimal" and is viewed as a means of presenting a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. *Straka v. Comcast Cable*, --- F.Supp.2d ----, 2012 WL 4378575, \*6 (W.D. Pa. Sept. 25, 2012).

The first three elements appear uncontested: Alvarez is Hispanic and therefore a member of a protected class; he was qualified for his position, having performed it for several years prior to being dismissed; and he suffered an adverse employment action when he was terminated from his employment. Thus, it must be determined whether the fourth element has been satisfied, *to wit.*, whether circumstances that existed support an inference of discrimination.

Alvarez submits that there were several instances of discriminatory behavior against him which support an inference of discriminatory intent. These include: removing him from the Interview Panel and thus eliminating his ability to interview prospective employees within his department; being given poor performance reviews; being placed on multiple PIPs; being transferred to the third shift; failing to train him after placing him in a new department; disciplining him for infractions he did not commit; chastising him for complaining of unfair treatment; being yelled at in front of others; having his family and ethnicity

insulted; being overly criticized; and requiring him to perform more hours of observation than other managers.

Defendants contend that Alvarez in unable to demonstrate a nexus between his race and his termination. They assert that Alvarez conceded he performed poorly and that he was unable to identify similarly-situated non-Hispanic employees who were treated more favorably than he.

Several of the actions cited by Alvarez create circumstances which give rise to a discriminatory inference. For example, when Alvarez was removed from the Interview Panel, it had two effects: it left him without the ability to participate in the selection of potential employees who would be under his supervision and also left the panel without participation by minority members. He also was transferred to the less-desirable third-shift, criticized in front of others, chastised for complaining of discriminatory treatment, given additional duties that Caucasian managers were not given, was disciplined for actions he contends he did not commit and was subjected to remarks about his ethnicity. Such conduct, if true, would establish that management was "out to get" Alvarez and/or encourage him to resign. Moreover, several of the allegations of discriminatory treatment cannot be attributed to any performance deficiencies by Alvarez and, without an explanation for such actions, indicate that Alvarez was treated differently. Thus,

an inference of discrimination has been raised. For purposes of the present motion, Alvarez has established a prima facie case of discrimination.

A prima facie case having been established, the burden now shifts to defendants to articulate a legitimate non-discriminatory reason for their action. They contend that Alvarez has admitted that he performed poorly in his position. They further assert that Alvarez provided inconsistent responses to an investigation, and that he discussed an investigation with another person, despite a clear instruction not to do so. Accordingly, the burden shifts back to Alvarez to establish that the reasons proffered by the defendants are pretextual. *See e.g., Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir.1997) (noting that the defendant's burden at this stage is relatively light and that it is satisfied if the defendant articulates a legitimate reason for the adverse employment action).

*(1) Performance*

Alvarez contends that he can establish theat the defendants' reasons are not worthy of credence. With respect to his job performance, Alvarez contends that, prior to 2006, he had received positive performance reviews. In January, 2008, he received his first Performance Improvement Plan ("PIP"), without being given prior warnings, either oral or written, beforehand. Nonetheless, Alvarez successfully completed the PIP and received positive mid-year and end-year

reviews. However, Muldowney indicated that Hall approached him in 2009 about terminating Alvarez, a decision with which Muldowney disagreed.

Alvarez was thereafter transferred to the third shift but states that the reasons for the transfer are conflicting. Both Diamond and Bannigan informed Muldowny that Hall wanted Alvarez out, and that he was to "sell" the third shift to him as an opportunity to advance. Hall testified that Alvarez was not moved to the third shift as punishment for poor performance but rather to give him an opportunity to excel. Roat, however, testified that the reason for the transfer was to give another manager exposure and to place someone with more experience and a larger breadth of knowledge on the third shift.

While it is possible that the different reasons for Alvarez's transfer to the third shift are not indicative of racial discrimination, Alvarez has shown that, through conflicting responses, that they may be unworthy of credence. By identifying the inconsistent explanations for his transfer to the third shift, Alvarez has met his burden of establishing pretext inasmuch as a reasonable factfinder could conclude that the defendants' proffered legitimate, non-discriminatory reasons for its actions are not to be believed.

*(2) Disparate treatment*

*(a) Accident reporting*

Alvarez further contends that he other employees similarly-situated to him were treated more favorably. While defendants contend that Alvarez received a write-up because he failed to timely report an accident, he contends that once he learned of the accident, he did report it promptly. Specifically, Alvarez testified that he learned of the accident at approximately 7:00 a.m. and that he filled out the paperwork around 11:00 a.m. (Doc. 29, Ex. B, p. 119:21–25).[7]

Alvarez contends that the issue of his reporting motivated his transfer to the third shift. He argues that Lawrence Pates, a Caucasian manager, failed to report an accident was not likewise transferred or subject to any discipline. Defendants contend that Pates was not immediately informed of the accident by the associate but, once he became aware of it, he made a report immediately. Thus, they contend, Pates is not similarly-situated. However, Pates did receive a write-up for the incident. Additionally, although Muldowney wanted to investigate the matter, Hall informed him to let it go and that the result would be the same. Muldowney

---

[7] To the extent there is a question of fact as to report made within a few hours is "immediate" or "prompt," it is conceivable that a report made within hours is "prompt" and, for purposes of the instant motion, Alvarez's report must be viewed as so.

further stated that Hall directed him (Muldowney) to speak with Pates so that he (Pates) was not deflated by the write-up.

The two situation appear factually similar yet resulted in different outcomes. *See Opsatnik v. Norfolk S. Corp.,* 335 F. App'x. 220, 222–23 (3d Cir.2009) ("Similarly situated" does not mean "identically situated," but the plaintiff must generally demonstrate that he was similar to the alleged comparators in all relevant respects); *Nguyen v. AK Steel Corp.*, 735 F. Supp.2d 346, 365 (W.D. Pa. 2010) ("[T]he test for determining whether a comparator is proper does not require the misconduct to be identical, but only that the comparator's misconduct be similar without such differentiating or mitigating circumstances as would diminish his or her conduct or the employer's treatment of such.); *Newring v. PNC Corp.*, No. 01-1973, 2006 WL 840347, *9 (W.D. Pa. March 29, 2006) ("To be similarly situated, employees must have engaged in the same behavior[.]"). Giving Alvarez the benefit of all reasonable inferences, there is evidence that others outside of the protected class were treated more favorably. Pates received only a write-up, which Hall apparently felt was unwarranted, but Alvarez was transferred to the less-desirable third shift after his accident-reporting was questioned. Accordingly, this incident may also support a finding of pretext.

*(b) Shift transfer*

When transferred to the third shift, Alvarez was informed it was a temporary move and that he would be permitted to transfer back to the first-shift. However, despite several requests to transfer back to the first-shift, Alvarez states that he was not permitted to do so. He cites to two individuals, Craig Griffith and Carl Sheriff, who were permitted to transfer back to their original shifts. Thus, he contends, other non-Hispanics were similarly-situated to Alvarez yet were treated more favorably that he.

Defendants assert that these two individuals were not, in fact similarly-situated to Alvarez. Rather, Griffith's shift was changed in response to a physician's recommendation. Sheriff did not transfer shifts but was temporarily assigned to a different shift. These circumstances differentiate them from Alvarez and, consequently, they are not similarly-situated to him.

*(c) Additional job requirements*

Alvarez also contends that after he was transferred to the third shift, he was required to perform 10 hours of observation per week although other managers were only required to perform 3 hours of observation. The parties dispute whether, in fact, this increased level of observation was required of Alvarez. However, viewing the facts in a light most favorable to him as the non-movant, the court

must assume that the added observation hours were imposed on Alvarez. The presence of such a additional job requirement that was not imposed on other managers could be viewed by a factfinder as discriminatory. Consequently, this argument could support Alvarez's demonstration of pretext.

Having concluded that Alvarez has established a prima facie case of discrimination and that he has presented sufficient evidence that could lead a reasonable factfinder to conclude that the proffered reasons may be pretextual, defendants are not entitled to judgment on this issue. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); *Sheridan E.I. DuPont de Nemours and Co.*, 100 F.3d 1061 (3d Cir.1996) (same).

*(B) Retaliation*

Alvarez also brings a claim for retaliation under Title VII, §1981 and the PHRA. Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3.

Similarly, the PHRA declares it to be an "unlawful discriminatory practice" for an

employer "to discriminate in any manner against any individual because such

individual has opposed any practice forbidden by [the PHRA], or because such

individual has made a charge, testified or assisted, in any manner, in any

investigation, proceeding or hearing under [the PHRA]." 43 PA. STAT. § 955(d).[8]

There are two kinds of protected activity that Title VII's anti-retaliation

provision recognizes: (1) participation "in certain Title VII proceedings (the

'participation clause')" and (2) opposition to "discrimination made unlawful by

Title VII (the 'opposition clause')." *Moore v. City of Philadelphia*, 461 F.3d 331,

341 (3d Cir. 2006) (quoting *Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d

Cir. 2006)). Both clauses impose an exacting standard on a plaintiff making a Title

VII retaliation claim: "Whether the employee opposes, or participates in a

proceeding against, the employer's activity, the employee must hold an objectively

---

[8] As to retaliation claims, like the discrimination claim, federal courts have construed Title VII and the PHRA to provide covered employees with the same degree of statutory protection. *Howard v. Blalock Elec. Service, Inc.*, 742 F.Supp.2d 681, 704 (W.D. Pa. 2010). Additionally, the Third Circuit Court of Appeals has also concluded that retaliation claims asserted under § 1981 should be examined in accordance with the framework applicable to retaliation claims asserted under Title VII. *Verdin v. Weeks Marine, Inc.*, 124 F. App'x. 92, 97 (3d Cir.2005) (treating a § 1981 retaliation claim as identical to a Title VII retaliation claim).

reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII. Moreover, the employee's 'opposition' to unlawful discrimination must not be equivocal." *Id*. (internal citations omitted) (citing *Clark County v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam), *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996), and *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)).

Establishing a prima facie case of retaliation under Title VII requires a plaintiff to adduce evidence that (1) he engaged in activity protected by Title VII, (2) the employer took adverse action against him, and (3) there was a causal connection between the plaintiff's engagement in protected activity and the adverse employment action. *Moore*, 461 F.3d at 340–41 (quoting *Nelson v. Upsala Coll.*, 41 F.3d 383, 386 (3d Cir. 1995); *accord Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). If the plaintiff makes this prima facie showing, the same *McDonnell Douglas* burden-shift approach applies. *Moore*, 461 at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)) (citing *Fuentes*, 32 F.3d at 764).

Defendants contend that Alvarez is unable to demonstrate either the first or third elements. They do not, however, dispute the second element — that Alvarez suffered an adverse action when he was terminated.

*(1) Protected activity*

Alvarez argues that he took protected action by complaining of discriminatory treatment. He asserts he complained of the discrimination to Banningan a few months after his first PIP was presented to him in January, 2008. (Doc 31-4, Ex. D ¶ 8). Alvarez states that he expressed his concerns about discrimination, telling Bannigan that he felt that he was being treated differently than Caucasian managers. (*Id*.). He states he raised such concerns to Bannigan several times. (*Id*.¶ 9). Alvarez also states that, within a few weeks of being transferred to the third shift in May, 2009, he told McKinney that he felt he was being discriminated against. *(Id*. ¶12). He further states that he had such conversations with McKinney on several occasions. (*Id*. ¶ 13).

Defendants contend that Alvarez's statements on this issue, contained in a certification submitted in response to the summary judgment motion, constitute a sham affidavit and must be disregarded. The Court of Appeals for the Third Circuit has explained:

> A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant.

*Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir.2007).

Although they contend that the certification is in conflict with his deposition testimony, defendants have not identified the specific testimony that they contend is contradictory. Specifically, they argue that when testifying about his 2007 year-end review, Alvarez did not state that he had complained about discrimination. However, while there may not have been testimony on this matter, it does not appear that Alvarez was directly questioned on it. Therefore, it cannot be concluded that his present certification contradicts his earlier deposition testimony if the issues were not specifically addressed. Consequently, the certification, on this issue, does not constitute a sham affidavit which must be disregarded. Further, having stated that he complained about discriminatory treatment, he has established that he engaged in protected activity and, therefore, has satisfied the first prong a retaliation claim.

Alvarez also asserts that he sent an email to defendants on October 20, 2009 which, he contends, stated that he believed he was "being stereotyped as a latino who is a liar." Defendants contend that the email merely states that Alvarez believed that he was being "stereotyped as a liar," and contained no reference to race. As such, defendants argue that the email fails to establish that Alvarez engaged in protected conduct inasmuch as generalized complaints of unfair

treatment are insufficient to establish a prima facie case of retaliation. *See Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir.2006) (citing *Barber*, *supra*).

To the extent there is a factual dispute raised as to whether the email contained reference to Alvarez's ethnicity, for purposes of summary judgment, this fact must be viewed in a light most favorable to Alvarez as the nonmovant. Consequently, one must assume that the email did state, as Alvarez claims, that he believed he was being stereotyped as a latino who is a liar. Such a remark is sufficient to constitute protected activity and satisfy the first element of a prima facie case of retaliation.

*(2) Causal connection*

As to the third element, Alvarez maintains that he has established a causal connection between raising his complaint of discrimination in October, 2009 and his termination in January, 2010. Defendants contend that the three months between these two occurrences is to remote to establish a causal connection between them.

"[T]he mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Krouse, supra* at 503 (quoting *Robinson v.*

*City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir.1997)). When the timing of the

adverse employment action is "'unusually suggestive'" of retaliatory motive, then

a causal link may be inferred. *Id*. (quoting *Robinson*, 120 F.3d at 1302); *Marra v.*

*Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir.2007) ("In certain narrow

circumstances, an unusually suggestive proximity in time between the protected

activity and the adverse action may be sufficient, on its own, to establish the

requisite causal connection."). Absent temporal proximity, however, "courts may

look to the intervening period for other evidence of retaliatory animus." *Id*. at 504;

*see also Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir.2003) ("In

cases such as this one, where the temporal proximity is not so close as to be

unduly suggestive, we have recognized that timing plus other evidence may be an

appropriate test [.]" (citation and internal quotation marks omitted)); *Abramson v.*

*William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir.2001) (to establish a

causal connection, plaintiff must show either temporal proximity between the

protected activity and the adverse employment action, or evidence of ongoing

antagonism.).

     For a causal connection to be made, the temporal proximity between the

occurrences has generally been in terms of hours or days, not months. *See, e.g.,*

*Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989) (holding that a causal link

can be inferred where only two (2) days passed between the employee's protected activity and the adverse employment action); *Conklin v. Warrington Twp.*, No. 06–2245, 2009 WL 1227950, *3 (M.D. Pa. April 30, 2009) (case law suggests that the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence). As noted above, Alvarez complained of discriminatory treatment approximately three months before he was terminated. This fact alone is insufficient in temporal proximity to trigger a reasonable inference of retaliation. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir.2004) (finding no temporal proximity unduly suggestive of retaliation with two months between protected activity and termination); *Thomas*, 351 F.3d at 114 (3d Cir.2003) (finding that three weeks between filing of complaint and termination did not present suggestive temporal proximity); *Tarr v. Fedex Ground Package System, Inc.*, No. 08-1454, 2010 WL 331846, * 10 (W.D. Pa. Jan. 28, 2010) ("Plaintiff complained in July of 2006 and was terminated in April of 2007. There is therefore, nothing unusually suggestive about the timing of his termination."); *Koteles v. ATM Corp. of America*, Civ. A. No. 05-1061, 2008 WL 4412098, *16 (W.D. Pa Sept. 23, 2008) (noting that while the court of appeals has not enumerated a stringent formula for what is considered to be too long of a gap between the protected activity and adverse action, the span

of several months has been considered too great). Consequently, an inference of discrimination cannot be drawn thereon.

However, Alvarez has also cited ongoing antagonism in this three-month period to support a causal connection between his complaint of discrimination and his termination. He maintains that he was subjected to increased scrutiny and questioned about every action; that Hall singled him out and reprimanded him in the presence of others; and that his garbage was gone through and, although he is a diabetic, he was accused, falsely, of eating candy and drinking soda in the warehouse, which is not permitted. Such acts arguably permit an inference of causation to be drawn between his complaint of discrimination to his termination.

Accordingly, a prima facie case for retaliation has been made. Moreover, as noted above, although defendants have articulated a legitimate, non-discriminatory reason for its actions—that Alvarez had performed poorly—Alvarez has put forth sufficient evidence to allow a reasonable factfinder to conclude defendants' reason is pretextual for discrimination. It is therefore recommended that summary judgment be denied on this claim.

*(C) Hostile Work Environment*

The Court of Appeals for the Third Circuit has established five elements a plaintiff must establish to succeed on a hostile work environment claim:

(1)     the plaintiff suffered intentional discrimination because of his
        or her membership in the protected class;

(2)     the discrimination was pervasive [or severe];[9]

(3)     the discrimination detrimentally affected the plaintiff;

(4)     the discrimination would have detrimentally affected a
        reasonable person of the same protected class in that position;
        and,

(5)     the existence of respondeat superior liability.

*Shahin v. College Misericordia*, No. 3:CV-02-0925, 2006 WL 2642355, at *11

(M.D. Pa. Sept.13, 2006) (citing *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753

(3d Cir. 1995)). A court should consider all the circumstances in determining

whether an environment is hostile or abusive, including "the frequency of the

discriminatory conduct; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance." *Id*. (quoting *Harris v. Forklift Systems, Inc.*, 510

U.S. 17, 23 (1993).

---

[9] The Third Circuit had required that discriminatory harassment be "pervasive and regular." *See, e.g.*, *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001); *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir.1995). In *Pennsylvania State Police v. Suders*, the Supreme Court of the United States made it clear that the harassment must be "sufficiently severe or persuasive to alter the conditions of [the complainant's] employment." 542 U.S. 129, 133-34 (2004); *see also Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006).

Courts must bear in mind that "Title VII is not 'a general civility code for the American workplace.'" *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *implied overruling on other grounds recognized by Moore v. City of Philadelphia*, 461 F.3d 331, 2006 WL 2492256, at *8–9 (3d Cir. 2006) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80-81 (1998)). Title VII is not violated by "[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee" or by mere "discourtesy or rudeness," unless so severe or pervasive as to constitute an objective change in the conditions of employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citations omitted). Thus, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)" are not actionable under Title VII. *Id*. at 788. In examining a hostile work environment claim, a court should focus not on individual incidents, but rather, on the overall situation to determine whether a plaintiff suffered intentional discrimination. *See Jensen, supra; Cardenas v. Massey*, 269 F.3d 251, 261–62 (3d Cir. 2001).

Alvarez contends that, looking at the totality of circumstances, the cited examples of discrimination were severe and/or pervasive and that another Hispanic manager would be detrimentally affected by, *inter alia*, challenges to his integrity, interference with his ability to perform his job and being relieved of

several duties. Defendants, however, contend that Alvarez cites only one remark over the course of his long employment that could, arguably, be viewed as racially related—Roat's statement asking Alvarez about doing a "taco dance." They further cite Alvarez's own deposition testimony, where he admitted that no one ever made any racial remarks to him, to support their position that he has failed to establish a claim for hostile work environment. Thus, the parties dispute whether the actions cited by Alvarez constitute intentional discrimination based on race, whether the actions were pervasive or severe and whether the actions would detrimentally affect a reasonable person in Alvarez's position who was also Hispanic.

"[T]he advent of more sophisticated and subtle forms of discrimination requires that [courts] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Cardenas,* 269 F.3d at 261–62. Facially neutral conduct in addition to overt racial discrimination can support a hostile work environment claim. *Id.* However, there must be at least some overt racially hostile words or conduct to signal the invidious nature of the facially neutral conduct. For example, the court of appeals has held that, in light of the plaintiff's supervisor's facially discriminatory comments about the plaintiff's

ethnicity, the facially neutral management decisions complained of by the plaintiff

constitute evidence "from which a jury might find ethnic animus underlying other

ostensibly nondiscriminatory incidents." *Id.* at 262. While a court must be mindful

that facially neutral actions can constitute invidious discrimination, there must be

some evidence in the record, beyond a plaintiff's own speculation and bald

assertions, that suggests that those facially neutral actions were motivated by

racial animus. *Brooks v. CBS Radio, Inc.*, No. 2007 WL 4454312, *13 (E.D. Pa.

Dec. 17, 2007). However, acts of harassment need not be "accompanied by

racially discriminatory statements." *Aman*, 85 F.3d at 1083. ("[O]vert racial

harassment is not necessary to establish a hostile environment.").

In addition to the remark about a taco dance, English testified that Hall

stated that he (Hall) believed there were too many minorities and that Hall asked

English if he had his crack pipe. Additionally, English testified that Roat referred

to him as "buckwheat." Such statements suggest a discriminatory attitude towards

minorities such as Alvarez and could arguably be the reason for the otherwise

facially neutral pattern of conduct which Alvarez considered hostile to his

employment. Accordingly, while these statements could be stray remarks that

alone are insufficient to establish a claim for a hostile work environment, when

coupled with the other alleged actions cited by Alvarez, such as being given poor

performance reviews, being transferred to the third shift, being disciplined for infractions he did not commit and being yelled at in front of others, the totality of circumstances may be viewed as sufficiently severe or pervasive to alter one's working conditions. Although some of these allegations appear facially neutral, when coupled with the overtly racial comments cited above, a fact-finder could reasonably conclude that there was a racial animus behind the actions. Consequently, for purposes of a motion to dismiss, Alvarez has put forth sufficient evidence to establish a prima facie case.

## V. Recommendation

For the foregoing reasons, it is respectfully recommended that defendants' motion for summary judgment (Doc. 27) be denied.

Signed on January 23, 2013.

MILDRED E. METHVIN
U. S. MAGISTRATE JUDGE